IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| ESTATE OF RICHARD LEE SHAFER, by and through its Personal Representative, Kristi Shafer, | Case No. 2:12-cv-00407-SU |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| CITY OF ELGIN, OREGON; ERIC KILPATRICK; and KEVIN LYNCH, | |
| Defendants. | |

_____

SULLIVAN, Magistrate Judge:

The Estate of Richard Lee Shafer, by and through its Personal Representative Kristi Shafer, filed an Amended Complaint asserting Fourth Amendment claims under 42 U.S.C. § 1983 and Oregon state law for wrongful death against the City of Elgin, Oregon (the "City"), Eric Kilpatrick ("Officer Kilpatrick"), and Kevin Lynch ("Chief Lynch"). Plaintiff alleges Officer Kilpatrick, acting within the scope of his employment as a police officer for the City, used unreasonable force when responding to a domestic dispute at the home of Richard and Gloria Shafer, which resulted in the fatal shooting of Richard Shafer. Chief Lynch was the Chief of Police for the City at the time of the incident. Plaintiff's Amended Complaint alleges: (1) a claim against Officer Kilpatrick individually for unreasonable force in violation of Richard Shafer's Fourth Amendment rights; (2) a claim against Chief Lynch individually for supervisor liability; and (3) a claim against the City for municipal liability.

On March 28, 2014, the court granted defendants' Motion to Bifurcate all trial issues related to the claim against Officer Kilpatrick for unreasonable force from the claim against Chief Lynch for supervisor liability and the claim against the City for municipal liability. (doc. # 64). Defendants now move for partial summary judgment (doc. # 47) on the claims against Chief Lynch and the City. For the reasons set forth below, defendants' motion is denied.[1]

## FACTUAL BACKGROUND

Elgin, Oregon is a small city in Eastern Oregon with a population of approximately 1,711 encompassing about one square mile in Union County. (Decl. of Jeff Groth Ex. 1 at 1, June 18,

---

[1] The parties have consented to the jurisdiction of a Magistrate Judge pursuant to Fed. R. Civ. P. 73(b). (doc. # 28).

2014.)  In 2011, the City of Elgin Police Department, a municipal police department, had a full-time

staff consisting of a chief of police, one police sergeant, and one police officer.[2]  (*Id.* Ex. 1 at 2.)

During the time period alleged in plaintiff's Amended Complaint, these persons were Chief Lynch,

non-party Sergeant Nick Pallis ("Sgt. Pallis"), and Officer Kilpatrick.  Sgt. Pallis left the Department

in June of 2011, to join the Union County Sheriff's Department.  (Nick Pallis Dep. 13:12–21, Jan.

30, 2013.)  On August 1, 2011, Chief Lynch was out of the country and Officer Kilpatrick was in

charge of the Police Department.   (Kevin Lynch Dep. 39:17–19, 68:18–69:1, Jan. 25, 2013.)

On the morning of August 1, 2011, Gloria Shafer called 9-1-1 from her home in Elgin.  (Am.

Compl. ¶¶ 9–10; Gloria Shafer Dep. 114:12–18, Jan. 21, 2013 ("G. Shafer Dep."))  Gloria was in

the process of moving out of the home, which she shared with her husband Richard Shafer and the

couple's 11-year-old son John Shafer.[3]  (Am. Compl. ¶¶ 9, 12; G. Shafer Dep. 73:9–11, 76:9–11.)

Gloria requested the presence of a police officer because Richard objected to her removing property

from the residence and told her she couldn't leave unless she had a police escort.  (Am. Compl. ¶ 10;

G. Shafer Dep. 111:9–23, 112:22–25, 114:8–18.)

Officer Kilpatrick was at his home when he received a call dispatching him to the Shafer

residence for a domestic disturbance.  (Am. Compl. ¶ 10; Eric Kilpatrick Dep. 109:9–110:2, Jan. 22,

2013.)  Officer Kilpatrick arrived at the Shafer residence approximately 20 minutes later.  (G. Shafer

Dep. 114:24–115:2; Kilpatrick Dep. 110:3–112:15.)  Gloria remained on the phone with the 9-1-1

operator during this time.  (G. Shafer Dep. 115:3–8.)  Officer Kilpatrick testified when he arrived

---

[2] The City of Elgin Police Department also utilizes five reserve police officers.  (Groth
Decl. Ex. 1 at 2.)

[3] For ease of reference the Shafers will be referred to by their given names.

at the Shafer residence, he listened from outside but did not hear any sounds of a disturbance inside the home. (Kilpatrick Dep. 112:23–113:7.) Officer Kilpatrick knocked on the door, Richard answered it, and told Officer Kilpatrick to come inside. (Am. Compl. ¶ 11; G. Shafer Dep. 157:16–19; Kilpatrick Dep. 113:8–16.) After Gloria concluded her telephone call in the kitchen area of the home, Officer Kilpatrick, Richard, and Gloria moved into the living room area of the home. (G. Shafer Dep. 157:16–159:6; Kilpatrick Dep. 114:13-115:10,116:10–117:7.) John sat quietly in a loft at the top of a staircase overlooking the living room area. (G. Shafer Dep. 171:2–4; Kilpatrick Dep. 126:19–127:13; John Shafer Dep. 23:3–11, Jan. 21, 2013 ("J. Shafer Dep."))

Officer Kilpatrick told the couple: "I'm here to listen. I know this is going to take some time." (Kilpatrick Dep. 117:8–10.) Richard then told Gloria she couldn't take any guns with her, and the couple began listing various calibers and discussed who owned which gun. (Kilpatrick Dep. 117:11–14.) Initially, Officer Kilpatrick did not see any firearms in the living room area. (Kilpatrick Dep. 117:15–16.) Gloria picked up a box containing ammunition and stated she intended to take it outside to her van. (G. Shafer Dep. 115:19–20, 159:7–11; Kilpatrick Dep. 118:16–119:9.) Richard blocked Gloria and stood with his fists clenched at his side. (G. Shafer Dep. 115:19–20, 159:23–160:15; Kilpatrick Dep. 119:14–120:14.) Gloria complained to Officer Kilpatrick who told Richard he couldn't stop her from taking anything and needed to let her go.[4] (G. Shafer Dep. 115:21–22, 160:16–24; Kilpatrick Dep. 120:22–24, 124:24–125:10.) Richard stepped aside and Gloria walked out the front door to put the ammunition box in her van. (G. Shafer Dep.

---

[4] Officer Kilpatrick testified he did not tell either person what property they could and could not take as Oregon law permits police officers to divide property only with a court order. (Kilpatrick Dep. 124:9–23.)

Page 4 - OPINION AND ORDER

160:25–162:10; Kilpatrick Dep. 120:25–121:2.) Gloria returned to the residence less than a minute later. (G. Shafer Dep. 162:9–10; Kilpatrick Dep. 122:22–123:3.)

The parties dispute the events that occurred after Gloria came back inside the house.[5] According to Gloria, she came back inside the house and while walking towards the kitchen area of the home she heard Richard ask Officer Kilpatrick "If I want to – so, what you're saying is if I want to keep something, I have to take it someplace else?" to which Officer Kilpatrick replied "Yes." (G. Shafer Dep. 115:9–25, 162:11–20.) According to John, Richard then said "I'm going to get my AR-15." (J. Shafer Dep. 25:23–26:4.) Gloria testified she then saw Richard walk over to his recliner in the living room, reach behind it, and pull out an AR-15 assault rifle. (G. Shafer Dep. 164:7–9, 164:25–165:3, 168:2–5.) Both Gloria and John claim they saw Richard point the barrel of the AR-15 to the floor, eject the magazine clip, empty the chamber, and tell Officer Kilpatrick "It's empty, I'm taking it to the truck." (G. Shafer Dep. 116:1–24, 118:22–119:20, 120:20–121:7, 168:6–25, 171:15–25; J. Shafer Dep. 26:24–27:3, 28:7–30:15.) Officer Kilpatrick denies these events. (Kilpatrick Dep. 133:11–19, 138:8–20.)

According to Officer Kilpatrick, when Gloria came back inside the house, Richard asked him, "so she can just take whatever she wants and leave?" (Kilpatrick Dep. 123:4–5, 123:19–22, 133:18–19.) Officer Kilpatrick claims he did not answer Richard's question and instead turned to have a conversation with Gloria, while Richard walked away. (Kilpatrick Dep. 123:6–18; 124:2–8, 125:11–18.) Officer Kilpatrick testified before he was able to begin a conversation with Gloria, out of the corner of his eye he saw Richard do a stopping motion, and then turn back around holding a

---

[5] A detailed review of the disputed incident resulting in Richard's death is helpful to the analysis regarding the liability of Chief Lynch and the City.

rifle. (Kilpatrick Dep. 127:14–24.) According to Officer Kilpatrick, he then spun around and saw Richard facing him holding the AR-15, while looking at Gloria, and with the barrel pointed up in the direction of John, who was still sitting quietly in the loft of the staircase. (Kilpatrick Dep. 130:2–7, 130:11–13, 131:2–4.)

It is undisputed that while Richard was holding the AR-15, Officer Kilpatrick drew his pistol with his right hand, aimed it full extension at Richard, and ordered him to drop the AR-15.[6] (G. Shafer Dep. 129:22–25, 171:6–10; J. Shafer Dep. 30:16–25; Kilpatrick Dep. 130:6–18.) Richard did not respond and Gloria turned towards the kitchen, covered her face, and began to cry. (G. Shafer Dep. 171:11–13, 174:6–8; Kilpatrick Dep. 130:14–25, 131:19–132:2.) With his pistol still drawn, Officer Kilpatrick claims he began to close the distance between him and Richard in attempts to take control of the AR-15. (Kilpatrick Dep. 133:6–10, 133:20–23.) At the same time, Officer Kilpatrick drew his taser with his left hand. (Kilpatrick Dep. 133:25–134:10.) Officer Kilpatrick testified he then saw Richard's hand move, he heard a metallic snick, and this caused him to fire his taser from waist height. (Kilpatrick Dep. 134:13–16, 139:18–25, 158:4–16.) Officer Kilpatrick missed Richard with the taser probes and then moved in attempting to dry stun him with the taser. (Kilpatrick Dep. 134:17–22, 158:4–16.) However, when Officer Kilpatrick attempted to dry stun Richard, the taser skidded off the AR-15, and he dropped the taser. (Kilpatrick Dep. 134:23–25, 135:7–13, 136:6–10.) Gloria testified she did not see these events occur as she was still turned towards the kitchen covering her face, however she testified she heard a taser sound twice. (G.

---

[6] Officer Kilpatrick testified he yelled at Richard twice to "drop the weapon." (Kilpatrick Dep. 130:9, 130:17–23.) Gloria testified Officer Kilpatrick yelled at Richard three times to "drop the f##king gun." (G. Shafer Dep. 129:22–25, 171:6–10.) John testified Officer Kilpatrick told Richard "drop the gun" five times. (J. Shafer Dep. 30:16–25; 37:4–22.)

Shafer Dep. 132:1–16, 133:19–24, 173:18–174:11.)  John testified however that he saw Officer

Kilpatrick shoot his taser at Richard, hit him on the shoulder, and Richard started twitching.  (J.

Shafer Dep. 31:1–34:23.)

The parties also dispute the events that occurred after Officer Kilpatrick used his taser.

According to Officer Kilpatrick, he grabbed the foregrip of the AR-15 and told Richard "give me

that."  (Kilpatrick Dep. 134:25–135:3, 136:11–15.)  Officer Kilpatrick testified Richard would not

let go of the AR-15 and the two began to struggle.  (Kilpatrick Dep. 136:16–137:17.)  Officer

Kilpatrick claims Richard then jerked back the AR-15, causing Officer Kilpatrick to lose his grip.

(Kilpatrick Dep. 137:18–22, 138:4–7, 140:12–18.)  Officer Kilpatrick testified he then saw the barrel

of the AR-15 coming towards his face and he backed up.  (Kilpatrick Dep. 140:19–20, 141:4–12,

142:16–18.)  With his pistol still drawn, Officer Kilpatrick testified he then shot Richard five times.

(Kilpatrick Dep. 140:21–25.)  According to Officer Kilpatrick, Richard fell back into his recliner still

holding the AR-15 in his hands.  (Kilpatrick Dep. 140:25–141:3, 145:10–15, 147:3–7.)  Officer

Kilpatrick testified John screamed and Gloria said "Jesus, Eric, I didn't want you to shoot him."

(Kilpatrick Dep. 147:16–18.)

According to Gloria, while facing the kitchen with her hands covering her face, after she

heard the taser sound twice, she then heard a loud thud which she believed to be the sound of

Richard dropping the AR-15.  (G. Shafer Dep. 132:1–134:2, 138:23–25.)  Gloria testified she then

heard a gunshot and turned around to see Officer Kilpatrick shoot Richard three times.  (G. Shafer

Dep. 134:1–10, 138:11–22, 174:12–16; 182:25–183:16.)  Gloria claims the AR-15 was on the

ground before the first bullet was fired at Richard.  (G. Shafer Dep. 134:23–135:8, 135:23–25.)  She

Page 7 - OPINION AND ORDER

then saw Richard fall back into his recliner, twitching and dying.  (G. Shafer Dep. 174:12–18; 177:20–178:1.)

According to John, after Officer Kilpatrick used the taser, Richard still had the AR-15 in his hands, Officer Kilpatrick shot him, and then Richard dropped the AR-15.  (J. Shafer Dep. 34:24–35:25.)  According to John the barrel of the AR-15 was pointed to the ground when Officer Kilpatrick shot Richard.  (J. Shafer Dep. 36:1–6.)  John claims Officer Kilpatrick shot Richard a total of three times.  (J. Shafer Dep. 36:20–22.)

Both Gloria and John testified after Officer Kilpatrick shot Richard, he then turned and pointed his gun at them and ordered them to "drop the gun" to which Gloria responded "what gun?"[7] (G. Shafer Dep. 178:2–19; J. Shafer Dep. 44:11–45:3.)  Officer Kilpatrick testified he saw John holding a gun and then John screamed and put his hands up.  (Kilpatrick Dep. 147:18–148:9.) Officer Kilpatrick called out on his police radio "shots fired, I need an ambulance, man down." (Kilpatrick Dep. 148:17–18.)  Officer Kilpatrick then lowered his gun and Gloria and John left the house.  (G. Shafer Dep. 179:1–14; Kilpatrick Dep. 148:23–149:21.)  Officer Kilpatrick followed Gloria and John out the front door and then went back inside to check on Richard.  (G. Shafer Dep. 179:15–180:7.)  Richard died on the scene.[8]  (Am. Compl. ¶ 15.)

---

[7] Gloria testified Officer Kilpatrick yelled to her and John "drop the f##king gun" multiple times.  (Shafer Dep. 178:3–13.)

[8] Officer Kilpatrick has not filed a motion for summary judgment. *See Torres v. City of Madera,* 648 F.3d 1119 (9th Cir. 2011) (discussing excessive force).

## EVIDENTIARY OBJECTIONS

As a preliminary matter, the court must consider defendants' evidentiary objections made in their reply brief.  Defendants argue certain evidence submitted by plaintiff is not relevant, contains improper opinion testimony, and contains inadmissible hearsay.[9] (Defs.' Reply at 2–16.)  Plaintiff responded to these evidentiary objections in surreply pursuant to L.R. 56–1(b).

In a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  The court must determine what evidence is admissible, relevant, and substantive.  Fed. R. Evid. 104.  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

I.    <u>Witness Declarations</u>

Plaintiff offers several declarations from witnesses who allege that prior to the shooting of Richard Shafer, Officer Kilpatrick had either used force or threatened use of force against other Elgin residents.  Defendants argue many of these declarations are not relevant, contain improper opinion testimony, and contain inadmissible hearsay.  (Defs.' Reply at 4–9.)

---

[9] Defendants objected to any evidence related to how Officer Kilpatrick acted outside of the Shafer residence after the shooting on August 1, 2011 as not relevant.  (Defs.' Reply at 4.) The court will assume defendants object to the deposition of Allen Williams, a witness who testified he arrived at the Shafer residence immediately after the shooting.  (Allen Williams Dep. 39:20–42:14; 45:11–49:12, Jan 28, 2013.)  This evidence has been offered regarding punitive damages against Officer Kilpatrick.  (Pl.'s Resp. Defs. Mot. Part. Summ. J at 67–68.) Defendants' objection has been withdrawn. (Defs.' Reply at 35 n.9). As such, the court will not consider this evidence in addressing defendants' motion.

A.    Relevance Objections

Defendants object to the declarations of Scott Huffman, Candy Huffman,[10] Amber Parks, John Michler, Lisa Johnson, Randy Laber, Robert Trump, Tom Leonard, and Tony Wise as not relevant.  (Defs.' Reply at 4–9.)  Evidence is considered "relevant" if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  All of the declarations concern prior use of force or prior threatened use of force by Officer Kilpatrick.  As such, the court finds these declarations relevant to plaintiff's claims against Chief Lynch and the City.  Defendants' relevance objections are overruled.

B.    Lay Witness Testimony

Defendants object to statements in the declarations of John Michler, Lillian Wall, Randy Laber, and Rodney Terry as improper opinion testimony.  (Defs.' Reply at 5–8.)  A lay witness may provide opinion testimony so long as it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701; *see also Fireman's Fund Ins. Cos. v. Alaskan Pride P'ship*, 106 F.3d 1465, 1468 & n.3 (9th Cir. 1997) (discussing Fed. R. Evid. 701).

---

[10] Defendants also object to the statement in Ms. Huffman's declaration: "I did not complain to [Chief Lynch] or to any members of the Elgin City Council about this incident because I did not feel it would do any good."  (Decl. of Candy Huffman ¶ 8, April 12, 2014.)  Defendants argue this statement is speculative.  (Defs.' Reply at 5.)  The court does not find this statement speculative as it is an expression of the witness' reason for not reporting the incident.  Defendants' objection is overruled.

1.    John Michler

Defendants object to the statement in Mr. Michler's declaration: "I do not feel Eric Kilpatrick should have deployed his taser on me that day." (Decl. of John Michler ¶ 3, April 10, 2014.) The court finds this statement is rationally based on Mr. Michler's lay perception of the circumstance he describes, helpful to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge. Defendants' objection is overruled.

2.    Lillian Wall

Defendants object to the statement in Lillian Wall's declaration: "[f]rom the look on Mr. Kilpatrick's face, I was afraid Mr. Kilpatrick was going to shoot Mr. Bryson." (Decl. of Lillian Wall ¶ 5, May 6, 2014.) The court finds this statement is rationally based on Ms. Wall's lay perception of what she observed regarding Officer Kilpatrick, helpful to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge. As such, defendants' objection is overruled. Defendants also argue this statement is speculative. (Defs.' Reply at 6.) The court does not find this statement speculative as the witness described what she feared would happen based on Officer Kilpatrick's behavior not necessarily what would happen. Defendants' objection is overruled.

3.    Randy Laber

Defendants object to Randy Laber's statement to Chief Lynch that Officer Kilpatrick's conduct during a car chase incident "was outrageous." (Decl. of Randy Laber ¶ 4, April 12, 2014.) The court finds this statement is rationally based on Mr. Laber's lay perception of events that he had observed, helpful to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge. Defendants' objection is overruled.

Page 11 - OPINION AND ORDER

4.    Rodney Terry

Defendants object to statements in the declaration of Rodney Terry: "I was parked some distance from Kilpatrick and posed no threat to him at all and was shocked when Kilpatrick unexpectedly pulled out his pistol, pointed it at me and yelled, 'You're not going to run me over! I'll blow your ass away!' I felt like Kilpatrick pulled his gun on me for no justifiable reason." (Decl. of Rodney Terry ¶ 3, April 9, 2014.) The court finds these statements rationally based on Mr. Terry's lay perception of events he had observed, helpful to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge. Defendants also argue these statements are speculative. (Defs.' Reply at 8.) The court does not find these statements speculative as the witness describes events he observed and his lay opinion regarding those events. Defendants' objections are overruled.

C.    Hearsay Objections

Defendants object to statements in the declarations of Amber Parks, John Michler, and Lisa Johnson as hearsay. (Defs.' Reply at 5–7.) Hearsay is defined as an out-of-court statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801. Hearsay is admissible only if it qualifies as an exception to the general hearsay rule.

1.    Amber Parks

Defendants object to the statement in Ms. Parks declaration: "In mid-July, 2011, I was discussing Eric Kilpatrick with my mother and other family members. We all agreed that one of these days Eric Kilpatrick was going to shoot somebody. Approximately two weeks later Kilpatrick shot and killed Richard Shafer." (Decl. of Amber Parks ¶ 4, April 8, 2014.) Defendants also argue this statement is speculative and improper opinion testimony. (Defs.' Reply at 5.) The court finds

Page 12 - OPINION AND ORDER

this statement admissible only with regard to Ms. Parks' lay perception of Officer Kilpatrick's behavior not for the truth of the matter asserted, i.e. that Officer Kilpatrick was going to "shoot somebody."  Defendants' objections to this statement are overruled.

> 2.    John Michler

Defendants object to the statement in Mr. Michler's declaration: "Kilpatrick pointed his finger at me and said, 'You're going to do what we tell you to do.'" (Decl. of John Michler ¶ 3, April 10, 2014.)  The court finds this statement not hearsay as it is a statement of a party opponent.  Fed. R. Evid. 801(d)(2)(A).   Defendants' hearsay objection is overruled.

> 3.    Lisa Johnson

Defendants object to the statement in Ms. Johnson's declaration: "I ran outside and said, 'Excuse me Eric, why are you abusing him?'" (Decl. of Lisa Johnson ¶ 6, April 12, 2014.)  The court finds this statement is not offered for the truth of the matter asserted, but rather to show how the witness reacted what she observed as Officer Kilpatrick's behavior.  Defendants' hearsay objection is overruled.

II.    Witness Depositions

Plaintiff offers excerpts of depositions from witnesses who allege prior to the August 1, 2011 shooting at the Shafer residence, Officer Kilpatrick had either used force or threatened use of force against other Elgin residents.[11]   Defendants  argue statements by Rick Smith, J.R. Fruitts, Kevin

---

[11]   Defendants objected to all deposition transcripts submitted by plaintiff on the ground they are not properly authenticated.  (Defs.' Reply at 12–13.)  Plaintiff failed to include a copy of the reporter's certificate for each deposition transcript as required under *Orr v. Bank of America*, 285 F.3d 764, 774 (9th Cir. 2002).  However, plaintiff corrected this oversight and authenticated the deposition transcripts.  (*See* Am. Decl. of Gary J. Susak, Sept. 18, 2014.)  Accordingly, defendants' objection to all deposition transcripts based on authentication is moot.

Linville, Kari Sue Moore, Gidget Sannar, and William Halsey are speculative and improper opinion

testimony.  (Defs.' Reply at 13–16.)   For purposes of defendants' motion, this court will consider

the deposition testimony of Mr. Smith, Mr. Fruitts, and Ms. Moore as particularly relevant to the

issues regarding supervisor liability against Chief Lynch and municipal liability against the City.

The statements of Mr. Linville, Ms. Sannar and Mr. Halsey which defendants object to will not be

considered and the court declines to rule on the objections to such testimony at this time.[12]

A.    Rick Smith

Rick Smith testified about an incident outside his store: "I didn't want to get hit by a

ricochet." (Rick Smith Dep. 28:6–12, Jan. 28, 2013); "[Officer Kilpatrick looked like he was going

to shoot somebody based on] what I saw." (Smith Dep. 28:22–24.)  The court does not find these

statements speculative and further finds these statements are rationally based on Mr. Smith's lay

---

[12] Kevin Linville was a reserve officer for the Union County Sheriff's Department and testified about times he had been called to back up Officer Kilpatrick: "My own opinions were that, one of the calls that we responded to, the situation was usually not in control.  Very chaotic. Very confused." (Kevin Linville Dep. 14:14–16, June 21, 2013); "The best word I could describe it as is not having control of the situation, not sure of how to diffuse."  (Linville Dep. 17:7–9); "...the people involved were already agitated, and [Officer Kilpatrick's] presence made it worse."  (Linville Dep. 17:14–15.)

When questioned about how she felt after hearing allegations of use of force by Officer Kilpatrick, Gidge Sannar testified: "Yeah. I thought he was dangerous."  (Gidget Sannar Dep. 13:17–18, Sept. 24, 2013); "He was out of control."  (Sannar Dep. 14:22, 27:8.)

When asked "[d]id you fear that [Officer Kilpatrick] would pull guns on people?" William Halsey answered "Yes."  (William Shannon Halsey Dep. 83:20–22, Jan. 30, 2013.) When asked about his reaction to the Shafer shooting incident, Mr. Halsey testified: "So yeah, this was not a surprise.  And the comments since then that you hear from most folks in Elgin, that this was not a surprise, it was going to happen sooner or later, they just didn't know with who . . . [t]hat somebody was going to get killed, that somebody was going to get shot, in a situation like this."  (Halsey Dep. 87:7–11, 14–16.)

perception of events that he observed, helpful in determining a fact in issue, and not based on scientific, technical, or other specialized knowledge.  Defendants' objections are overruled.

Furthermore, defendants object to the "File Memo" attached as an exhibit to Mr. Smith's deposition transcript.  (Susak Am. Decl. Ex. 26 at 7.)  Defendants argue the File Memo has not been authenticated, contains improper opinion testimony, and contains hearsay.  (Defs.' Reply at 14.)  The court does not rely on the "File Memo" attachment when addressing defendants' motion and therefore declines to rule on this objection at this time.

      B.     <u>J.R. Fruitts</u>

J.R. Fruitts testified about a land dispute between his neighbors: "And quite frankly, [Officer Kilpatrick was] just losing his mind."  (J.R. Fruitts Dep. 25:8, Jan. 29, 2013); "And that was when I told [Chief Lynch] that as far as I was concerned, he shouldn't be a police officer, he couldn't maintain his mental state, and he was going to kill somebody."  (Fruitts Dep. 32:1–4); "Kilpatrick lost it.  He was out of control."  (Fruitts Dep. 41:5–6); "And it wasn't so much threatening, as it was unbalanced psychologically . . . He had no reason to be threatened or feel threatened or to threaten anybody."  (Fruitts Dep. 58:9–14.)  The court does not find these statements speculative and further finds these statements are rationally based on Mr. Fruitt's lay perception of what he observed regarding Officer Kilpatrick's behavior, helpful to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge.  Defendants' objections are overruled.

      C.     <u>Kari Sue Moore</u>

Kari Sue Moore testified about traffic stops she witnessed by Officer Kilpatrick and stated: "My personal impression was that he seemed to be extremely nervous and intense on every one of those occasions."  (Kari Sue Moore Dep. 27:12–14, Sept. 24, 2013); "The manner in which he

walked up to the car.  As I said, I'm not accustomed to police officers pulling people over and then getting out of their cars with their hand on their holster . . . And so, I guess that lead me to believe that he was nervous." (Moore Dep. 28:11–17.)  The court does not find these statements speculative as these statements are rationally based on Ms. Moore's lay perception of what she observed regarding Officer Kilpatrick's behavior, helpful to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge.  Defendants' objections are overruled.

III.    Expert Witness Reports

Defendants object to sections of reports by plaintiff's expert witness.  (Defs.' Reply at 9–12.) Plaintiff has produced reports from Michael D. Lyman, an expert with over 40 years of experience as a law enforcement agent, criminal investigator, police trainer, and educator, and Stephen M. Yerger, an expert with over 23 years of experience as a professional law enforcement trainer.  (Decl. of Michael D. Lyman, June 13, 2014; Decl. of Stephen M. Yerger, June 26, 2014.)  Both expert witnesses reviewed the record and provided their professional opinion regarding the events at the Shafer residence on August 1, 2011, Officer Kilpatrick's hiring and training, Chief Lynch's response to citizen complaints about Officer Kilpatrick, and the City of Elgin Use of Force Policy.  (*Id.*)

Expert testimony is admissible when scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue.  Fed. R. Evid. 702. Additionally, the court is required to ensure the reliability and relevancy of all expert testimony before admitting it.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) (scientific testimony is admissible only if it is both relevant and reliable); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 146 (1999) (court's "gatekeeping" function applies to all forms of expert

testimony).    The Ninth Circuit has generally allowed expert testimony about proper police procedures and policies.  *See e.g. Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005).

A.    Opinion Concerning August 1, 2011 Shooting Incident

Defendants object to the sections of Dr. Lyman's report and Mr. Yerger's report regarding their opinions of the events at the Shafer residence on August 1, 2011.[13]  (Defs.' Reply at 3, 11–12.)  In their reports, both Dr. Lyman and Mr. Yerger opined Officer Kilpatrick made numerous errors while responding to the domestic disturbance at the Shafer Residence.  (Lyman Decl. Ex. A at 8–16; Yerger Decl. at 13–17.)  Defendants argue this information is not relevant to the claims for which they seek summary judgment.  (Defs.' Reply at 3, 11–12.)  Alternatively, defendants argue the sections of these expert reports make impermissible legal conclusions.  (*Id.*)  The court does not rely on these sections of Dr. Lyman's report and Mr. Yerger's report when addressing defendants' motion and therefore declines to rule on these objections at this time.

B.    Reliance on Witness Declarations and Depositions

Defendants also object to the sections of Dr. Lyman's report and Mr. Yerger's report about how Chief Lynch and the City handled alleged citizen complaints about Officer Kilpatrick.  (Defs.' Reply at 9–10.)  In formulating their opinions, Dr. Lyman and Mr. Yerger reviewed many of the witness declarations and deposition transcripts discussed above.  (Lyman Decl. Ex. A at 17–20; Yerger Decl. at 8–12.)  Defendants argue because many of these witness declarations and deposition

---

[13]  Defendants also request the court strike "plaintiff's inaccurate statements" related to the August 1, 2011 shooting incident.  (Defs.' Reply at 3–4.)  The statements defendants cite to are not evidence, but rather arguments contained in plaintiff's responsive brief.  (*See* Pl.'s Resp. Defs. Mot. Part. Summ. J. at 56–57.)  Furthermore, both statements are clearly identified in plaintiff's brief as plaintiff's version of the events of August 1, 2011.  (*See id.*)  As such, the court declines to strike these statements.

transcripts are inadmissible evidence, these sections of Dr. Lyman's report and Mr. Yerger's report are similarly inadmissible.  (Defs.' Reply at 9–10.)

As discussed above, the court finds all of the witness declarations admissible evidence. Furthermore, the court declines to rule on evidentiary objections in the depositions of Kevin Linville, Gidget Sannar, and William Halsey.  Although this evidence is part of the record reviewed by Dr. Lyman and Mr. Yerger, neither relied on evidence the court declines to rule on in reaching their opinion about how Chief Lynch and the City should have handled citizen complaints.[14]  (*See* Lyman Decl. Ex. A at 17–20; Yerger Decl. at 8–12.)  Defendants' objections are overruled.

C.    Interpretation of Psychological Assessment

Defendants object to the sections of Dr. Lyman's report and Mr. Yerger's report regarding Officer Kilpatrick's pre-hiring psychological assessment.  (Defs.' Reply at 10.)  Both Dr. Lyman and Mr. Yerger believe a stress-related limitation identified in Officer Kilpatrick's psychological assessment should have been a "red flag" to Chief Lynch and the City that Officer Kilpatrick was a risky hire.  (Lyman Decl. Ex. A at 16–17; Yerger Decl. at 6–7.)  Defendants argue because neither Dr. Lyman nor Mr. Yerger are medical experts, neither are qualified to interpret the statements contained in Officer Kilpatrick's psychological assessment.  (Defs.' Reply at 10.)  The court does not rely on these sections of Dr. Lyman's report and Mr. Yerger's report when addressing defendants' motion and therefore declines to rule on these objections at this time.

---

[14]  Dr. Lyman reviewed the deposition summaries of Mr. Linville and Mr. Halsey. (Lyman Decl. Ex. A at 25.)  Mr. Yerger reviewed the deposition of Mr. Halsey. (Yerger Decl. at 3.)  Neither expert referred to these depositions in their respective reports.

D.      Impermissible Legal Conclusions

Finally, defendants argue several statements in Dr. Lyman's report and Mr. Yerger's report are impermissible legal conclusions.  (Defs.' Reply at 11–12.)  Defendants object to the statement in Dr. Lyman's report: "Chief Lynch's failure to properly address the problem actions and behaviors of Kilpatrick resulted in Kilpatrick remaining on the police force and ultimately using unreasonable deadly force against Richard Shafer." (Lyman Decl. Ex. A at 17).[15]  Defendants also object to the statement in Mr. Yerger's report: "[i]ndustry standards define pointing a firearm at a citizen as not only the 'use of force,' but it is the use of deadly force."  (Yerger Decl. at 11.)

An expert witness may provide opinion testimony that embraces an ultimate issue to be decided by the trier of fact.  Fed. R. Evid. 704(a).  "That said, an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.  Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir.2008)  (*quoting Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir.2004)) (emphasis in original).  However, experts may refer to terminology from applicable law in expressing their opinions.  *See id.* at 1060.

A police practices expert may opine regarding police practices, what acceptable force is, and whether defendants' conduct was or was not appropriate. *See Fontana v. City of Federal Way*, 2014

---

[15] Defendants also object to the statement: "Chief Lynch's failure to take any action after this shooting, considering the environment that he created in the Elgin Police Department regarding the use of force by condoning Officer Kilpatrick's prior actions, amounts to a ratification of his actions in the shooting of Richard Shafer."  (Defs.' Reply at 11.)  Contrary to defendants' argument, this statement does not appear in Dr. Lyman's report, but rather it is an argument contained in plaintiff's responsive brief.  (*See* Pl.'s Resp. Defs. Mot. Part. Summ. J. at 52.)  As such, defendants' objection is overruled.

WL 202104, *3 (W.D. Wa. Jan. 17, 2014).  However, the expert may not express an opinion in terms

of whether defendants "violated plaintiff's Fourth Amendment rights," used "excessive force," or

used force that is consistent with a finding of excessive force as those are impermissible legal

conclusions.  *See id.*  None of the statements identified by defendants in Dr. Lyman's report and Mr.

Yerger's report are improper legal conclusions.  Defendants' objections are overruled.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The party seeking summary judgment bears the initial burden of demonstrating no genuine

dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  All material

facts are resolved in a light most favorable to the nonmoving party.  *Id*. at 331.  The court must

accept all evidence and make all inferences in favor of the nonmoving party.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

Plaintiff asserts that prior to the death of Richard Shafer, Chief Lynch and the City failed to

train Officer Kilpatrick in the use of force, failed to investigate citizen complaints alleging

unreasonable force by Officer Kilpatrick, and failed to discipline Officer Kilpatrick for unreasonable

force.  (Am. Compl. ¶¶ 17–18, 20–24, 32–33.)  Plaintiff alleges the conduct of Chief Lynch and the

City were contributing causes of the death of Richard Shafer.  (*Id.* ¶¶ 19, 26.)

I.    Claim Against Chief Lynch

Plaintiff alleges Chief Lynch is individually liable for supervisor liability.  Defendants argue

they are entitled to summary judgment on plaintiff's claim against Chief Lynch because there is no

evidence that prior to the shooting of Richard Shafer, Chief Lynch failed to train Officer Kilpatrick, investigate citizen complaints about Officer Kilpatrick, or discipline Officer Kilpatrick for unreasonable use of force. (Defs.' Mem. Supp. Mot. Partial Summ. J. at 16–22.) In the alternative, defendants argue Chief Lynch is entitled to qualified immunity. (*Id.* at 22–23.) Additionally, defendants argue they are entitled to summary judgment on the issue of punitive damages against Chief Lynch. (*Id*. at 31.)

Supervisory officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Ninth Circuit has found a police chief may be held individually liable as a supervisor under § 1983: (1) for his own culpable action or inaction in the training, supervision, or control of his subordinates; (2) for his acquiescence in the constitutional deprivation of which the complaint is made; or (3) for conduct that showed a reckless or callous indifference to the rights of others. *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007) (internal citations and quotations omitted); *see also Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998); *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). In a case alleging excessive force by a police officer, liability of the police chief depends on whether he "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Blankenhorn*, 485 F.3d at 485 (internal citations omitted).

A.     Officer Kilpatrick's Hiring and Training

Officer Kilpatrick began working for the City of Elgin Police Department as a reserve officer in November 2005. (Kilpatrick Dep. 16:7–10.) Chief Lynch later interviewed Officer Kilpatrick

for a full-time officer position and hired him in June 2007. (Lynch Dep. 8:17–9:4, Kilpatrick Dep. 18:19–25.) Officer Kilpatrick went to the police academy on January 7, 2008, and received his basic-training certificate on October 8, 2008. (Lynch Dep. 9:11–24; Kilpatrick Dep. 19:1–3; Decl. of Leslie A. Edenhofer Ex. 7, Jan. 6, 2013.)

On February 29, 2008, Chief Lynch approved the Elgin Police Department's Use of Force Policy, which was in effect on August 1, 2011. (Lynch Dep. 22:11–23:11; Edenhofer Decl. Ex. 8; Susak Am. Decl. Ex. 4 at 12–25.) The policy requires training on the use of force and lethal weapons at least once annually. (Edenhofer Decl. Ex. 8 at 4.) Lethal weapons training must be conducted by a certified weapons instructor. (*Id.*) The policy also requires training for less lethal weapons "utilized/carried by officers" at least once annually. (*Id.*) This training may be in-service instruction, a written test, or hands on proficiency training. (*Id.*) Chief Lynch testified he provided the annual training and Officer Kilpatrick attended. (Lynch Dep. 23:12–21; Kilpatrick Dep. 49:14–24.) However, Chief Lynch also testified he did not provide any specific training to Officer Kilpatrick regarding when he should or should not draw his gun. (Lynch Dep. 34:22–35:2.)

In addition to the annual trainings provided by Chief Lynch, Officer Kilpatrick received various trainings from the Oregon Department of Public Safety Standards and Training ("DPSST") between 2006 and 2011 on firearms, tasers, handgun qualification, rifle qualification, SWAT training, defensive tactics, domestic violence, and other use of force. (Kilpatrick Dep. 19:13–22, 21:2–25, 23:4–24:25, 28:7–14; Edenhofer Decl. Ex. 7.)

B.      Citizen Complaints to Chief Lynch

      1.      Lillian Wall

In the summer of 2009, Lillian Wall alleges she came home to her house in Elgin, which she shared with her boyfriend Paul Bryson.  (Wall Decl. ¶ 4.)  Officer Kilpatrick was in his patrol car parked across the street from their house.  (*Id.* ¶ 4; Kilpatrick Dep. 94:20–23.)  Ms. Wall contends when she went inside the home, she got in a non-violent verbal argument with Mr. Bryson and after a few minutes walked out of the house to her car.  (Wall Decl. ¶ 5.)  Ms. Wall asserts Mr. Bryson followed her out of the house and was "practically on his knees" begging her not to leave.  (*Id.*)  Officer Kilpatrick however testified he could see Ms. Wall and Mr. Bryson shoving each other through a big window on the side of their house.  (Kilpatrick Dep. 94:24–95:1, 96:11–16.)  Officer Kilpatrick also described them as "barreling out the door."  (Kilpatrick Dep. 95:2–12.)

      Officer Kilpatrick turned on his overhead lights, pulled into the driveway, and got out of his patrol car.  (Wall Decl. ¶ 5; Kilpatrick Dep. 95:2–3.)  Officer Kilpatrick testified as soon as the couple saw him, they began kissing each other against the side of a car.  (Kilpatrick Dep. 95:15–23.)  Officer Kilpatrick drew his gun, pointed it at them, ordered them to put their hands up, and they complied.[16]  (Kilpatrick Dep. 95:23–25, 96:18–21; Wall Decl. ¶ 5.)  Ms. Wall alleges she yelled at Officer Kilpatrick and told him that neither of them had any weapons.  (Wall Decl. ¶ 5.)  According to Ms. Wall she did not know why Officer Kilpatrick was there because no one had called asking for help, and he eventually left.  (*Id.*)

---

      [16] Officer Kilpatrick testified he pointed his gun at Mr. Bryson.  (Kilpatrick Dep. 95:23–25, 96:18–21.)  Ms. Wall claims Officer Kilpatrick pointed his gun at both her and Mr. Bryson.  (Wall Decl. ¶ 5.)

According to Ms. Wall, she was very upset at what Officer Kilpatrick had done.  (*Id.* ¶ 6.) Ms. Wall claims the next day she told Sgt. Pallis about the incident.  (*Id.*)  Ms. Wall also claims she complained to Chief Lynch about the incident and told him "Eric had to go."  (*Id.*)  Officer Kilpatrick testified he spoke with Chief Lynch about the incident and Chief Lynch told him that he knew Officer Kilpatrick had recently come back from the academy but drawing a weapon is not very common, any time a weapon is drawn it is use of force, and it was probably not necessary for him to draw his weapon in that incidence.  (Kilpatrick Dep. 97:7–98:5.)  Chief Lynch testified he did not recall this incident.  (Lynch Dep. 29:9–30:3.)

### 2.    Bo Thompson

In July 2009, Officer Kilpatrick was having dinner at Sig's Restaurant in Elgin.  (Kilpatrick Dep. 57:10–13.)  Officer Kilpatrick sat next to a window and could see his patrol car parked outside. (Kilpatrick Dep. 57:15–17.)  While having dinner, Officer Kilpatrick testified he saw Bo Thompson trying to climb onto his patrol car.  (Kilpatrick Dep. 57:18–25.)  Officer Kilpatrick jumped up, slammed open the door to the restaurant, and rushed outside.  (*Id.*)  Officer Kilpatrick claims he recalls reaching for his gun, but did not point it at Mr. Thompson.  (Kilpatrick Dep. 58:1–7.) According to Officer Kilpatrick, Mr. Thompson was very intoxicated and was trying to mount a cardboard cutout of James Dean on top of his patrol car.  (Kilpatrick Dep. 58:8–13.)  Officer Kilpatrick testified he reacted this way in part because his patrol car and Chief Lynch's patrol car recently had their tires slashed.  (Kilpatrick Dep. 101:1–23.)

Jill Parsons was having dinner at Sig's and witnessed this incident.  (Jill Parsons Dep. 35:15–36:5, Jan. 23, 2013.)  Ms. Parsons testified Officer Kilpatrick slammed the door so hard, she thought the window was going to break.  (*Id.*)  Ms. Parsons also testified Officer Kilpatrick had his

hand on his gun during this incident, but she did not see his gun leave the holster. (Parsons Dep. 34:10–15; 36:18–21.) According to Ms. Parsons, after the incident Officer Kilpatrick came back inside the restaurant, went up to the counter, and apologized to the owner about the window. (Parsons Dep. 37:4–9.)

On July 12, 2009, Ms. Parsons wrote a letter to the Elgin City Council about the incident, as well as other concerns she had about the conduct and management of the Elgin Police Department. (Parsons Dep. 40:3–19; Susak Am. Decl. Ex. 25 at 4–7; Edenhofer Decl. Ex. 11.) Ms. Parsons' letter also states an unknown officer was with Officer Kilpatrick during this incident and she learned after the incident they pulled their guns on Mr. Thompson. (Susak Am. Decl. Ex. 25 at 5; Edenhofer Decl. Ex. 11 at 2.) In her letter, Ms. Parsons stated Officer Kilpatrick's conduct at Sig's was an overreaction and "[t]hose are the situations where someone gets mistakenly killed. You don't pull your gun for someone touching the police car and I would say there are few if not rare situations in Elgin that require a gun to be pulled." (Susak Am. Decl. Ex. 25 at 5; Edenhofer Decl. Ex. 11 at 2.)

Chief Lynch testified Officer Kilpatrick told him about the incident. (Lynch Dep. 30:21–31:10.) According to Chief Lynch, Officer Kilpatrick told him he drew his gun on Mr. Thompson, but holstered it when he discovered Mr. Thompson was unarmed. (Lynch Dep. 30:21–31:10.) Chief Lynch testified that in his opinion Officer Kilpatrick had acted appropriately in the situation, given he suspected Mr. Thompson may have had a weapon. (Lynch Dep. 31:11–32:2, 37:2–6.) Chief Lynch also claims he spoke with Mr. Thompson about the incident and Mr. Thompson told him he was surprised Officer Kilpatrick drew his gun on him, but understood why. (Lynch Dep. 37:7–21.) Chief Lynch also testified he recalled Ms. Parsons' letter, but he did

not make any changes in the Elgin Police Department as a result of reading the letter. (Lynch Dep. 45:23–47:7.)

        3.      <u>Rodney Terry, J.R. Fruitts, Marianne Zinzer</u>

In 2011, prior to the shooting of Richard Shafer, Rodney Terry and his neighbors Jeff Speer and Sandy Moline had a property dispute over an easement.[17] (Terry Decl. ¶ 3; Kilpatrick Dep. 64:23–65:13.) According to Officer Kilpatrick, Mr. Terry pulled up behind him in Elgin and told him if he didn't do something, someone was going to get killed. (Kilpatrick Dep. 65:14–16, 89:22–90:2.) Officer Kilpatrick notified dispatch and went out to the property until the County Sheriff could get there. (Kilpatrick Dep. 65:16–19.) The facts are not clear as to the precise events that occurred when Officer Kilpatrick arrived, however he testified when he arrived he had to take a pistol off of Mr. Speer. (Kilpatrick Dep. 65:20–66:2.) According to Mr. Terry, he then told Officer Kilpatrick that Mr. Speer and Ms. Moline had trapped someone in the property by locking a gate against a court order. (Terry Decl. ¶ 3.) Mr. Terry claims Officer Kilpatrick told him there was nothing he could do since it was a civil matter. (*Id.*)

According to Mr. Terry, he told Officer Kilpatrick he was going to use his tractor to open the gate and Officer Kilpatrick walked over to the gate. (Terry Decl. ¶ 3.) Mr. Terry claims he then got his tractor and parked it some distance from the gate. (*Id.*) While Officer Kilpatrick was talking to Mr. Speer and Ms. Moline at the gate, Mr. Terry contends Officer Kilpatrick unexpectedly pulled

---

[17] Mr. Terry's declaration states this event occurred on February 23, 2011. (Terry Decl. ¶ 3.) Officer Kilpatrick's report for this incident is dated April 23, 2011. (Kilpatrick Dep. 64:23–65:1.) Witnesses J.R. Fruitts and Marianne Zinzer testified they were unsure about the date. (J.R. Fruitts Dep. 14:3–14; Marianne Zinzer 15:7–25.)

out his gun, pointed it at him, and yelled "You're not going to run me over!  I'll blow your ass away!" (*Id.*)

Officer Kilpatrick, on the other hand, claims Mr. Terry told him he was going to get his pickup truck to ram the gate. (Kilpatrick Dep. 66:9–11.)  Officer Kilpatrick testified he went over to the gate, Mr. Terry left, and then Mr. Terry suddenly came driving down a hill on a gravel road in his pickup at a high rate of speed, which caused him to slide sideways. (Kilpatrick Dep. 66:12–16, 67:5–18.)  According to Officer Kilpatrick, he had no place to go and believed Mr. Terry was going to run him over, so he drew his gun and pointed it at the windshield of the pickup. (Kilpatrick Dep. 66:17–20, 67:12–18.)  Officer Kilpatrick testified Mr. Terry stopped the truck about eight feet from him, he removed Mr. Terry from the truck, and placed him in handcuffs. (Kilpatrick Dep. 66:20–67:25.)  According to Officer Kilpatrick, he detained Mr. Terry until the County Sheriff arrived. (Kilpatrick Dep. 69:3–5.)

Neighbors J.R. Fruitts and Marianne Zinzer were at their home when the above described event occurred. (J.R. Fruitts Dep. 22:5–7; Marianne Zinzer Dep. 15:24–16:1, Jan. 29, 2013.)  Both Mr. Fruitts and Ms. Zinzer testified they heard lots of yelling and saw police lights, so they got in their pickup truck and Mr. Fruitts drove them down their driveway to investigate, believing their farm animals may have been in the road. (Fruitts Dep. 22:8–24:20; Zinzer Dep. 16:2–17:11.)  When the couple arrived at the scene, Officer Kilpatrick had just detained Mr. Terry. (Kilpatrick Dep. 88:11–90:18.)  The couple claims as soon as they pulled up, Officer Kilpatrick immediately started yelling at them to get out of there, and as they opened the doors to the pickup, Officer Kilpatrick put his hand on his gun. (Fruitts Dep. 24:20–25:8, 35:12–36:17; Zinzer Dep. 17:12–22:13.)  Officer Kilpatrick testified he did not want anymore people on the scene. (Kilpatrick Dep. 91:15–93:6.)  Mr.

Fruitts testified in his opinion Officer Kilpatrick was "losing his mind" so he put the truck in reverse and drove home.  (Fruitts Dep. 25:9–16.)  Ms. Zinzer described the incident as "out of control." (Zinzer Dep. 23:9–14.)

Mr. Terry claims within a few days he went to Chief Lynch and complained Officer Kilpatrick had pointed his gun at him for no justifiable reason.  (Terry Decl. ¶ 3.)  Mr. Fruitts also claims he went to Chief Lynch and told him Officer Kilpatrick shouldn't be a police officer because he couldn't maintain his mental state and "was going to kill somebody."[18]  (Fruitts Dep. 31:8–32:4.) Officer Kilpatrick testified he discussed the incident with Chief Lynch was not reprimanded. (Kilpatrick Dep. 82:6–11.)  Chief Lynch testified he knew about the incident and in his opinion Officer Kilpatrick had acted appropriately.  (Lynch Dep. 32:10–24.)

C.    Supervisor Liability of Chief Lynch

Based on the evidence in the record, if a jury finds Officer Kilpatrick used unreasonable force against Richard Shafer, they could also find Chief Lynch liable as his supervisor.  There are issues of fact regarding whether Chief Lynch properly trained Officer Kilpatrick about when to point his gun at a citizen, and whether he properly disciplined Officer Kilpatrick after he learned Officer Kilpatrick pointed his gun at a citizen.  As a general principle, "[p]ointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger."  *Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002); *see also Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012) ("[w]e have held that force can be unreasonable even without physical blows or injuries."); *Cameron*

---

[18] Chief Lynch testified he did not recall discussing this specific incident with Mr. Fruitts, although he had many conversations with Mr. Fruitts.  (Lynch Dep. 32:25–34:1.)

*v. Craig,* 713 F.3d 1012, 1022 (9th Cir. 2013) (aiming a weapon may constitute excessive force). Chief Lynch testified he provided annual use of force training to Officer Kilpatrick as required by the Elgin Use of Force Policy.  (Lynch Dep. 23:12–21.)  However, Chief Lynch testified he never provided any specific training to Officer Kilpatrick about when he should or should not draw his gun.  (Lynch Dep. 34:22–35:2.)

The evidence shows at least three prior incidents where Officer Kilpatrick pointed his gun at Elgin residents and complaints were made to Chief Lynch.  In *Blankenhorn v. City of Orange*, the Ninth Circuit reversed the district court's grant of summary judgment to a police chief. *Blankenhorn*, 485 F.3d at 485–86.  The record in *Blankenhorn* showed the police chief approved an officer's personnel evaluations despite three serious complaints against the officer for excessive force.  *Id.*  The plaintiff's expert witness, "a former sergeant and lieutenant with twenty-seven years of experience in the Los Angeles County Sheriff's Department," opined that the police department's discipline of the officer in all three matters was insufficient.  *Id.* at 485.  The Ninth Circuit found the police chief's approval of the personnel evaluations, together with the expert testimony, could lead a jury to conclude the police chief "knowingly condoned and ratified actions by [the officer] that he reasonably should have known would cause constitutional injuries like the ones [the plaintiff] may have suffered."  *Id.* at 486.

The domestic dispute incident between Lillian Wall and Paul Bryson is particularly relevant to the claim against Chief Lynch.  Ms. Wall alleges after Officer Kilpatrick pointed his gun at them she complained to both Chief Lynch and Sgt. Pallis.  (Wall Decl. ¶ 5.)  Chief Lynch testified he did not recall this incident.  (Lynch Dep. 29:9–30:3.)  Officer Kilpatrick testified he discussed the incident with Chief Lynch who told him drawing a weapon is not very common, any time a weapon

is drawn it is use of force, and it was probably not necessary for him to draw his weapon in that incidence. (Kilpatrick Dep. 97:7–98:5.) Plaintiff's expert witness Stephen M. Yerger opined: "[t]his incident should have served as a warning sign that [Officer Kilpatrick] either needed to be reprimanded at work or sent to additional training to control what was obviously becoming a very aggressive and dangerous police officer." (Yerger Decl. at 8.)

In regards to the incident at Sig's restaurant, Chief Lynch testified Officer Kilpatrick told him he drew his gun but holstered it when he discovered Bo Thompson was unarmed. (Lynch Dep. 30:21–31:10.) Jill Parsons stated in her letter "[t]hose are situations where someone gets mistakenly killed. You don't pull your gun for someone touching the police car and I would say there are few if not rare situations in Elgin that require a gun to be pulled." (Susak Am. Decl. Ex. 25 at 5; Edenhofer Decl. Ex. 11 at 2.) Chief Lynch testified that in his opinion Officer Kilpatrick had acted appropriately and he did not do anything in response to Ms. Parsons' letter. (Lynch Dep. 31:11–32:2, 37:2–6, 45:23–47:7.) Plaintiff's expert Mr. Yerger however opined: "Jill Parsons was absolutely correct. However, [Chief Lynch] believed that [Officer Kilpatrick's] behavior was completely justified because there were reports of someone slashing tires in Elgin during that time period. Accordingly, [Chief Lynch] condoned and ratified this outrageously aggressive behavior by [Officer Kilpatrick] when he should have either reprimanded [Officer Kilpatrick] or recognized that additional training was needed to curtail [Officer Kilpatrick's] aggressiveness." (Yerger Decl. at 8–9.)

Rodney Terry alleges after the land dispute between him and his neighbors, he complained to Chief Lynch that Officer Kilpatrick had pointed his gun at him for no justifiable reason. (Terry Decl. ¶ 3.) J.R. Fruitts testified he also complained to Chief Lynch and told him that Officer

Kilpatrick "was going to kill somebody." (Fruitts Dep. 31:8–32:4.) Chief Lynch testified he recalled the incident and in his opinion Officer Kilpatrick had acted appropriately. (Lynch Dep. 32:10–24.) Plaintiff's expert Mr. Yerger however opined: "[Chief Lynch] should have either terminated [Officer Kilpatrick], reprimanded him, or forced [Officer Kilpatrick] to engage in additional training to address his aggressive behavior." (Yerger Decl. at 9–10.)

Defendants argue in order to hold a supervisor liable in an excessive force case, there must be evidence the officer previously used the same type of force that was used against the complaining plaintiff. (Defs.' Reply at 17–20.) Specifically, defendants argue that to hold Chief Lynch liable in this case, there must be evidence of a prior shooting by Officer Kilpatrick. (*Id.*) The court disagrees. In a case alleging excessive force by a police officer, liability of the police chief depends on whether he "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Blankenhorn*, 485 F.3d at 485; *see also Jones v. County of Sacramento*, 2010 WL 2843409, *7 (E.D. Cal. July 20, 2010) ("the Ninth Circuit has found a supervisor's conduct sufficient to establish the requisite causal link only when the supervisor engaged in at least some type of conduct *before* the unconstitutional incident and the supervisor knew or should have known that his conduct could cause the constitutional violation the plaintiff suffered.") (emphasis in original). Although there is no evidence of a shooting by Officer Kilpatrick prior to the shooting of Richard Shafer, a jury could find a causal link in this case from evidence that Chief Lynch knew Officer Kilpatrick repeatedly pointed his gun at unarmed Elgin residents.

Summary judgment is improper in a § 1983 claim alleging Fourth Amendment violations against a police chief for supervisor liability when there is evidence of prior citizen complaints made

against an officer for use of force, and the opinion of a qualified expert witness demonstrates the police chief failed to take remedial action in response to those complaints. *Blankenhorn*, 485 F.3d at 485–86. This case presents precisely that. The court finds there are issues of fact surrounding whether Chief Lynch took proper remedial action against Officer Kilpatrick after complaints were made to him that Officer Kilpatrick had pointed his gun at other Elgin residents. As such, defendants' motion for summary judgment on the § 1983 claim against Chief Lynch is denied.

     E.     <u>Qualified Immunity</u>

Defendants argue even if Chief Lynch is found to have violated Richard Shafer's constitutional rights, Chief Lynch is entitled to qualified immunity. (Defs.' Mem. Supp. Mot. Partial Summ. J. at 22–23.)

The doctrine of qualified immunity protects individual government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A determination of qualified immunity is a pure question of law. *See Phillips v. Hust*, 477 F.3d 1070, 1079 (9th Cir. 2007). In order to determine whether the doctrine of qualified immunity applies to individual defendants, the court must decide whether the plaintiff has shown that a constitutional or statutory right has been violated and whether the right at issue was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194 (2001). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While courts do not

require a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate. *Ashcroft v. al-Kidd*, — U.S. —, 131 S.Ct. 2074, 2083 (2011).

Defendants argue there is no legal authority which establishes "beyond debate" that Chief Lynch's action or inactions with regard to his supervision of Officer Kilpatrick violated Richard Shafer's constitutional rights. (Defs.' Mem. Supp. Mot. Partial Summ. J. at 23.) The court disagrees. In *Watkins v. City of Oakland*, the Ninth Circuit affirmed the district court's denial of qualified immunity to a police chief on summary judgment. *Watkins*, 145 F.3d at 1093–94. The court held it was clearly established in *Larez v. City of Los Angeles* that a jury could find the police chief liable for ratifying the officer's use of excessive force where evidence established a pattern of previous excessive force. *Id.* at 1093–94 (citing *Larez*, 946 F.2d at 646). As such, Chief Lynch is not entitled to qualified immunity.

F.     <u>Punitive Damages Against Chief Lynch</u>

An award of punitive damages is proper under § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Ward v. City of San Jose*, 967 F.2d 280, 286 (9th Cir. 1991) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Generally, "[t]he decision to impose such sanctions is within the exclusive province of the jury." *Id.* (citing *Kennedy v. L.A. Police Department*, 901 F.2d 702, 707 (9th Cir. 1989)). Here defendants assert in a conclusory fashion that there is no evidence that Chief Lynch "was ever motivated by evil motive or intent or exhibited reckless or callous indifference to Mr. Shafer's constitutional rights." (Defs.' Mem. Supp. Mot. Partial Summ. J. at 31.) The court disagrees with defendants.

The record demonstrates issues of fact regarding whether Chief Lynch knew about a pattern of unreasonable use of force by Officer Kilpatrick leading up to the shooting of Richard Shafer and whether he failed to take remedial action.  As a result, the court finds a reasonable jury could award punitive damages against Chief Lynch for exhibiting a reckless or callous indifference to Richard Shafer's constitutional rights.  Therefore, defendants' motion for summary judgment on the issue of punitive damages is denied.

II.    Claim Against City of Elgin

Defendants argue they are entitled to summary judgment on plaintiff's claim against the City because  because there is no evidence that prior to the shooting of Richard Shafer, the City failed to train Officer Kilpatrick, investigate citizen complaints about Officer Kilpatrick, or discipline Officer Kilpatrick for unreasonable use of force.  (Defs.' Mem. Supp. Mot. Partial Summ. J. at 23–31.)

A government entity may be held liable as a "person" under § 1983.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  It is well-settled that a city may not be held vicariously liable for the unconstitutional acts of its employees under a theory of *respondeat superior*.  *Id.* at 691.  To establish liability for a government entity under *Monell*, a plaintiff must demonstrate: (1) deprivation of a constitutional right, (2) due to the policy of a municipality, (3) which exhibits "deliberate indifference" to the plaintiff's constitutional right, and (4) the policy was the moving force behind the constitutional violation.  *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  Interpreting *Monell*, the Ninth Circuit has articulated three theories of municipal liability:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity."  Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-making authority"

and that the challenged action itself thus constituted an act of official governmental policy.  Whether a particular official has final policymaking authority is a question of state law.  Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992) (internal citations omitted).

When relying on the first theory of policy or practice, a plaintiff must demonstrate the existence of an official policy or widespread custom of illegal injurious conduct.  *Bd. of Cnty. Commis. v. Brown*, 520 U.S. 397, 403–04 (1997) (citations omitted).   The practices of the government officials must be "so permanent and well-settled as to constitute a 'custom or usage' with the force of law."  *Monell*, 436 U.S. at 691.  Proof of random acts or isolated events are insufficient to establish a custom.  *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989).  With this in mind, the court will review the evidence submitted by the parties.

A.      Oregon Association Chiefs of Police Review

On August 29, 2011, Chief Lynch made a formal request to the Oregon Association Chiefs of Police ("OACP") Executive Resources Committee for a review of the Elgin Police Department by the Agency Review Program ("ARP").  (Decl. of Jeff Groth ¶ 3, June 18, 2014.)  Chief Lynch testified the Elgin City Council asked him to make the request to the OACP because the police chief is the only person with authority to request an ARP review.  (Lynch Dep. 60:24–61:12.)  Elgin City Councilman Allan Duffy testified the City Council asked for the review because citizens had brought to his attention that the OACP had been successful in helping police departments and cities similar to Elgin.  (Allan Duffy Dep. 42:20–43:6, Jan. 22, 2013.)  Chief Lynch however testified he did not agree with the decision of the City Council because he felt it was bad timing due to the recent shooting of Richard Shafer.  (Lynch Dep. 61:13–17.)

Page 35 - OPINION AND ORDER

The OACP review team included Jeff Groth, Police Chief for the City of Sherwood, Oregon Police Department who was selected as team leader for the ARP review, Craig Junginger, Police Chief for the City of Gresham, Oregon, and Rick Lewis, Police Chief for the City of Silverton, Oregon.  (Groth Decl. ¶ 4.)   The ARP review process included four components: (a) preliminary research of the City of Elgin Charter, the Policy Manual of the Elgin Police Department, and the budget for the Elgin Police Department; (b) an on-site review in Elgin conducted by the review team on September 27 and 28, 2011; (c) a community forum in Elgin; and (d) preparation of a final report, including attachments, observations, suggestions, and recommendations. (*Id.* ¶ 5, Ex. 1 at 2–3.) The review did not include any investigation related to the shooting of Richard Shafer.  (*Id.*)  The final report was submitted to Chief Lynch on October 5, 2011.  (*Id.* ¶ 6, Ex. 1 at 1.)  Defendants have not objected to the report.  There is no dispute that Chief Lynch asked for the review at the request of the Elgin City Council. (Lynch Dep. 60:24–61:12.)

In their final report, the review team states they extensively reviewed the Elgin Police Department Policy Manual, both prior to their on-site review and while in Elgin.  (Groth Decl. Ex. 1 at 11.)  The review team found "[t]he manual is inadequate for any professional law enforcement agency and critical policies are missing."  (*Id.*)  One of the several areas the review team found the manual defective was the lack of a policy or procedure as to how or when a citizen complaint will be taken and how it will be investigated.  (*Id.* Ex. 1 at 12.)  In their report, the review team claims they were told all complaints about a department employee must be in writing and the department does not address verbal complaints.  (*Id.*)  The review team also discovered the Elgin Police Department did not have a complaint form.  (*Id.*)  Therefore in order to make a complaint about a department employee, a citizen is required to write a statement.  (*Id.*)  The review team also found

Page 36 - OPINION AND ORDER

there was no tracking of complaints made by citizens and no follow up with a citizen who files a complaint. (*Id.*)

The review team recommended the Elgin Police Department immediately implement a written policy outlining how and when a citizen complaint is taken. (*Id.* Ex. 1 at 15.) They suggested the department modify their complaint process to accept all forms of complaints including written, verbal, email and web-based, telephone, and third party/anonymous complaints. (*Id.*) This must be in a written policy available to the public to insure transparency and accountability of the police department. (*Id.*) Further, the review team recommended the Elgin Police Department implement a tracking system of citizen complaints against department employees, which serves as an "early warning" system to identify potential issues that may be occurring with an employee and allows the police chief to mentor, train, coach & educate, and/or discipline the employee. (*Id.*) Finally, the review team recommended the policy address how complaints will be investigated, the length of time the investigation should take, and the department must communicate the final outcome of the investigation to the complainant, unless the complaint was made anonymously. (*Id.*)

The review team also reviewed the Use of Force Policy and found it defective in several areas. (*Id.* Ex. 1 at 12.) The review team found the policy requires that an officer complete the form "Use of Force Report" anytime force is used against a citizen, however the form was not being used. (*Id.*) Instead any use of force by an officer was documented in narrative in the police report. (*Id.*) The policy also requires an annual use of force review be conducted, and since Use of Force Report forms were not being used by officers, the annual review data is obtained by going back through all police reports for the year to glean the information from narratives in the reports. (*Id.*) The review

Page 37 - OPINION AND ORDER

team found this practice is contrary to the Use of Force Policy and can lead to inaccuracies in reporting the total number of use of force instances. (*Id.* Ex. 1 at 12–13.)

The review team report states "[u]se of force documentation should be used by an agency as an 'early warning' tool to watch for instances of excessive force by officers and for potential problem officers who may use force when such force is not necessary." (*Id.* Ex. 1 at 13.) The review team also states they inquired as to what constitutes "use of force" that requires documentation in the agency. (*Id.*) The review team claims they were informed that use of force documentation was only required when an officer went "hands on" with someone and that pointing a firearm at a citizen did not require use of force documentation. (*Id.*) According to the review team, "[p]ointing a firearm is, in fact, a use of force by most standards." (*Id.*)

The review team recommended the Use of Force Policy be immediately updated to meet the current standards for Oregon. (*Id.* Ex. 1 at 16.) Instances involving use of force need to be documented on the appropriate Use of Force Report form and the review team offered to provide a more appropriate form upon request. (*Id.*) Furthermore, the review team recommended a system be put into place to ensure there is an annual review of all uses of force instances and so reports are filed and available for immediate inspection and use by the agency. (*Id.*) Finally, the review team opined the Use of Force Policy be expanded to include all recognized uses of force by a police officer, rather than those currently defined by the department. (*Id.*)

B.   Municipal Liability

Based on the evidence in the record, the court concludes that if a jury finds Officer Kilpatrick used unreasonable force against Richard Shafer, they could also find the City liable. Defendants admit that Chief Lynch answered to the City Council and/or the Mayor. (Defs.' Reply at 34; Lynch

Dep. 47:8–9; Pat McMullen Dep. 18:15–19, Sept. 24, 2013; Groth Decl. Ex. 1 at 14–15.)  The

OACP report specifically found that the responsibility for supervision of the Chief of Police was in

the hands of the City Council and that hiring and firing authority within the police department rested

with the City Council.  (Groth Decl. Ex. 1 at 15.)

       The OACP report states the review team extensively reviewed the Elgin Police Department

Policy Manual, both before and after their visit to Elgin, and found "[t]he manual is inadequate for

any professional law enforcement agency and critical policies are missing."  (Groth Decl. Ex. 1 at

11.)  One of the areas the OACP found the manual defective was the complete absence of a policy

or procedure as to how or when a citizen complaint will be taken and how it will be investigated.

(Groth Decl. Ex. 1 at 12.)  As discussed above, citizens complained to Chief Lynch that Officer

Kilpatrick had pointed his gun at them.  Members of the Elgin City Council testified when citizens

complained to them about Officer Kilpatrick, they referred the citizen to Chief Lynch.  In fact,

Councilwoman Kari Sue Moore testified: "[t]he Council agreed as a Council that all complaints

regarding personnel of the City would go to that person's department head, direct supervisor."

(Moore Dep. 24:9–11.)  Thus, there are issues of fact regarding Chief Lynch and the City Council

handling of citizen complaints about Officer Kilpatrick.  Further, the OACP found all complaints

about a Police Department employee must be in writing and that the Police Department does not

address verbal complaints. (Groth Decl. Ex. 1 at 12.) Councilman James Brainerd even testified that

if citizens complained about the police, there was nothing the City Council could do unless the

complaint was made in writing and the person identified themselves in the complaint.  (James

Brainerd Dep. 15:22–16:10, 28:5–29:3, Sept. 24, 2013.)  The court finds issues of fact over whether

the absence of an adequate policy regarding citizen complaints rises to the level of deliberate indifference by the City to Richard Shafer's constitutional rights.

The OACP also found several deficiencies in the written Use of Force Policy. (Groth Decl. Ex. 1 at 12.) Significantly, the OACP found that the Elgin Police Department defined "use of force" differently from the OACP. (*Id.* Ex. 1 at 13.) Elgin police officers were not documenting when they pointed a firearm at a citizen. (*Id.*) However, according to the OACP, "[p]ointing a firearm is, in fact, a use of force by most standards." (*Id.*) The OACP recommended the City immediately update their Use of Force Policy and expand it to include all recognized uses of force, including pointing a gun at a citizen. (*Id.* Ex. 1 at 16.)

In addition to the OACP report, plaintiff's expert witness Dr. Michael D. Lyman also examined the Use of Force Policy and opined that as written, the policy only requires officers to report use of force if injury results. (Lyman Decl. Ex. A at 21–22.) Dr. Lyman found the policy does not require officers to report instances where they point their gun at a citizen, contrary to industry standards. (*Id.*) In the opinion of Dr. Lyman, the failure to establish such a policy made it difficult, if not impossible, for administrators to track Officer Kilpatrick's pattern of misconduct, and could have avoided Officer Kilpatrick's encounter with Richard Shafer. (*Id.* Ex. A at 22.) Dr. Lyman opined Chief Lynch's failure to establish such a policy is inconsistent with nationally recognized recommendations in professional policing. (*Id.*)

As discussed above, the record shows after the incidents with Lillian Wall, Bo Thompson, and Rodney Terry, complaints were made to Chief Lynch that Officer Kilpatrick had pointed his gun at them. In addition to these incidents, plaintiff has submitted evidence that Officer Kilpatrick pointed his gun at Elgin residents Scott Huffman, Candy Huffman, Amber Parks, Jonathan Ludwig,

Page 40 - OPINION AND ORDER

Kevin Linville, and Sheila Gregory, all of whom were unarmed and posed no threat. (Decl. of Scott Huffman ¶ 6, April 12, 2014; Decl. of Candy Huffman ¶ 5, April 12, 2014; Decl. of Amber Parks ¶ 3, April 8, 2014, Jonathan Ludwig Dep. 12:12–18, 13:14–21, June 21, 2013; Kevin Linville Dep. 18:22–19:8, Sheila Gregory Dep. 29:18–30:17, 31:3–32:23, Jan. 28, 2013.) There is no record of complaints made to Chief Lynch about these incidents. According to plaintiff's expert Mr. Yerger, Chief Lynch would have learned about many of these incidents if the Elgin Use of Force Policy was consistent with industry standards and required Officer Kilpatrick to document when he pointed his gun at a citizen or allowed for citizens to make anonymous complaints. (Yerger Decl. at 10–12.) Mr. Yerger opined Chief Lynch then could have reprimanded Officer Kilpatrick or required him to engage in additional training. (*Id.*) Therefore, the court finds issues of fact regarding whether this deficiency in the Use of Force Policy rises to the level of deliberate indifference to Richard Shafer's constitutional rights.

Plaintiff also brings the claim against the City under a failure to train theory. Inadequate training may serve as the basis of municipal liability only after a three-part test has been met. *Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989); *City of Canton v. Harris*, 489 U.S. 378, 387–91 (1989). First, the existing training program must be inadequate. "A training program will be deemed adequate if it 'enable[s] officers to respond properly to the usual and recurring situations with which they must deal.'" *Merritt*, 875 F.2d at 770 (quoting *Canton*, 489 U.S. at 388). Second, if the training program is deemed inadequate, it may constitute a city policy, but only if the City's failure to train its employees evidences a "deliberate indifference" to the rights of individuals with whom the officers come into contact. *Id.* (citing *Canton*, 489 U.S. at 387). To prove deliberate indifference, plaintiff must show that "the need for more or different training [was] so obvious, and

the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* (citing *Canton*, 489 U.S. at 391).  Finally, the inadequate training must be shown to have "actually caused" the constitutional deprivation.  *Id.* (citing *Canton*, 489 U.S. at 391).

As discussed above for the claim against Chief Lynch, plaintiff's expert Mr. Yerger opined Officer Kilpatrick should have been required to engage in remedial training after Chief Lynch or the City Council received citizen complaints about Officer Kilpatrick.  The evidence shows prior to the shooting of Richard Shafer, Officer Kilpatrick had pointed his guns at other Elgin residents.  Chief Lynch testified he provided the annual use of force training to Officer Kilpatrick as required by the Use of Force Policy.  (Lynch Dep. 23:12–21.)  However, Chief Lynch testified he never provided any specific training to Officer Kilpatrick about when he should or should not draw his gun.  (Lynch Dep. 34:22–35:2.)  Therefore the court finds issues of fact over whether the City failed to train Officer Kilpatrick about when to point his gun at a citizen.

Defendants argue even if the City failed to adequately train Officer Kilpatrick, the failure to train a single officer is insufficient to establish a municipality's deliberate policy under *Monell*. (Defs. Mem. Supp. Partial Summ. J. at 25.)  In *Blankenhorn*, the Ninth Circuit explained "absent evidence of a 'program-wide inadequacy in training' any shortfall in a single officer's training 'can only be classified as negligence on the part of the municipal defendant—a much lower standard of fault than deliberate indifference.'"  *Blankenhorn*, 485 F.3d at 484–85.  Defendants fail to recognize the small population size of Elgin.  *See Giron v. City of Alexander*, 2009 WL 2998946, *12 & n.31 (E.D. Ark. Sept. 11, 2009) (noting that whether a pattern of conduct existed is specific to the facts of the particular case, including the small size of the city.)  The Elgin Police Department is a

municipal police department with a full-time staff consisting of a police chief, one police sergeant, and one police officer.  (Groth Decl. Ex. 1 at 2.)  After Sgt. Pallis left the department in June 2011, Officer Kilpatrick was the only police officer in Elgin.  As such, even applying *Blankenhorn*, a reasonable jury could find the City's failure to train Officer Kilpatrick a "program-wide inadequacy in training" for purposes of *Monell*.  *See Blankenhorn*, 485 F.3d at 484–85.

Plaintiff also brings the claim against the City under a failure to discipline theory.  A municipal policy may be inferred from "widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded."  *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233–34 (9th Cir. 2011) (internal citations omitted); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).  A plaintiff may prove a widespread practice where several different officers independently engage in the same unconstitutional conduct.  *See Menotti*, 409 F.3d at 1148.  For the same reasons as the failure to train theory, the court finds given the small size of the Elgin police department, a reasonable jury could conclude the City failed to discipline Officer Kilpatrick.  Plaintiff's expert Mr. Yerger opined Officer Kilpatrick should have been disciplined after Chief Lynch or the City Council received citizen complaints about Officer Kilpatrick's use of force.  As such, a reasonable jury could also conclude the City's failure to discipline Officer Kilpatrick constituted a policy for purposes of *Monell*.

Finally, defendants argue there is no evidence of a causal connection between the City's actions or inactions and the shooting of Richard Shafer.  (Defs.' Mem. Supp. Mot. Partial Summ. J. at 27, 30.)  The court disagrees.  Plaintiff has raised issues of fact regarding whether the Use of Force Policy was sufficient to protect the constitutional rights of Richard Shafer, how the City handled citizen complaints about Officer Kilpatrick, whether Officer Kilpatrick was properly trained

in use of force by the City, and whether the City properly disciplined Officer Kilpatrick for prior use of force. The issue of causation is for a jury to decide. *See Brown*, 520 U.S. at 404 (plaintiff must also show the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights). Therefore, defendants' motion for summary judgment on the *Monell* claim against the City is denied.

## CONCLUSION

Based upon the foregoing, defendants' Motion for Partial Summary Judgment (doc. # 47) is denied.

IT IS SO ORDERED.

Dated this 21st day of November, 2014.

/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge